**CLERK'S OFFICE**
**A TRUE COPY**
**Jul 03, 2024**
s/ D. Olszewski
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   24   MJ   137
Information associated with Facebook account "Antonio )
Antonyo" (www.facebook.com/antonio.a.franklin) & Instagram account )
"highway_tone_tone (instagram.com/highway_tone_tone) stored at )
premises owned, maintained, controlled, or operated by Meta Platforms, Inc. )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, §§ 1001, 1343, 1347 | Materially False Statement, Wire Fraud, Health Care Fraud |
| Title 42, § 1383a | Social Security Fraud |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Cathleen Schultz   Digitally signed by Cathleen Schultz
Date: 2024.07.02 12:37:34 -05'00'

*Applicant's signature*

Cathleen Schultz, Special Agent WI DOJ DCI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:   07/03/2024

*Judge's signature*

City and state:   Milwaukee, WI                    William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Cathleen Schultz, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook and Instagram user IDs that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. (Meta), an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way, Menlo Park, California 94025.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A) to require Meta to disclose to the government copies of the records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

2.      I am a Special Agent with the Wisconsin Department of Justice–Division of Criminal Investigation, assigned to the Medicaid Fraud Control and Elder Abuse Unit (MFCEAU) since November 2023. MFCEAU investigates and prosecutes civil and criminal offenses related to the Medicaid program, including allegations of Medical Assistance Fraud and Theft by Fraud.

3.      In the capacity of a Wisconsin Department of Justice–Division of Criminal Investigation Special Agent, assigned to MFCEAU, I am involved in complex investigations and audits of Medicaid-funded programs and providers, home health agencies, hospitals, medical clinics, nursing homes, adult family homes, and pharmacies to identify fraud. Medicaid-funded programs may include fee for service, self-directed, health maintenance, or managed care. My

duties include conducting interviews of witnesses, complainants, and suspects to obtain information and evidence; reviewing medical records for indications of fraud; collecting, utilizing, and interpreting information from computerized databases; collecting, protecting, and preserving evidence, maintaining its admissibility for court proceedings; and obtaining, reviewing, and maintaining financial records related to investigations. While employed with MFCEAU, I am responsible for conducting investigations related to alleged fraud, abuse, and neglect committed by Medicaid providers against Medicaid recipients and the Medicaid program.

4.     Prior to joining the Wisconsin Department of Justice, I served as a sworn law enforcement officer for 15 years with the City of Sun Prairie Police Department in Wisconsin. Over the course of my career, I have led or assisted in a wide variety of criminal investigations, including homicides, recklessly endangering safety, sexual assaults, embezzlements, etc. During my career, I have drafted and served legal process in the form of subpoenas and search warrants.

5.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that there are violations of Title 18, Sections 1001 (Materially False Statement), 1343 (Wire Fraud), and 1347 (Health Care Fraud) and Title 42, Section 1383a (Social Security Fraud), and that evidence related to these offenses is currently stored in the Facebook account "**Antonio Antonyo**" (**www.facebook.com/antonio.a.franklin**), and Instagram account "**highway_tone_tone** (**instagram.com/highway_tone_tone**). I further submit there is probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

2

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(1)(A). Specifically, the Court is a "district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS

7.     In early 2023, the Wisconsin Department of Justice's (DOJ) Medicaid Fraud Control and Elder Abuse Unit (MFCEAU) received a complaint involving Antonio Tawan FRANKLIN Sr. (DOB: 03/13/1979). The Wisconsin Department of Health Services (DHS) forwarded the MFCEAU a credible allegation of fraud referral involving Antonio FRANKLIN Sr.

8.     Antonio FRANKLIN Sr. is a participant in the Medicaid-funded program, IRIS (Include, Respect, I Self-Direct).

9.     Antonio FRANKLIN Sr. is also a recipient of Title 16 Supplemental Security Income (SSI) and State of Wisconsin SSI benefits.

## BACKGROUND ON IRIS PROGRAM

10.     The IRIS program is a caregiving program for adults with disabilities and elderly people in Wisconsin who require additional assistance with activities such as bathing, medication distribution, dressing, transportation, toileting, etc. The participant can choose their caregivers, referred to as Participant-Hired Workers (PHW), to assist with their individual needs. The participant needs to require the same level of care as someone living in a nursing home.

11.     To qualify for the IRIS program, a participant must meet the non-financial eligibility criteria for Medicaid. To qualify for Medicaid, an individual cannot have more than

3

$2,000 in assets and cannot make more than the Federal Poverty Guidelines' annual income of $15,060 ($1,255/month). The participant has annual evaluations which, in part, ensure their financial situation aligns with the Medicaid guidelines.

12.     The IRIS program has several different Fiscal Employer Agents (FEA) who assist IRIS participants in the program. FRANKLIN Sr.'s FEA is iLife. iLife manages FRANKLIN Sr.'s enrollment, ensures FRANKLIN's PHW is paid using the IRIS Medicaid funds, etc.

13.     The participant provides information for an annual long-term care functional screening (LTCFS). That information is used to assess what cares are needed, along with any medical diagnosis the participant has. FRANKLIN Sr.'s LTCFSs are completed by The Management Group (TMG), an IRIS Consultant Agency (ICA), which assists in the administration of the IRIS program.

14.     FRANKLIN Sr. has been an IRIS participant since 2012. FRANKLIN Sr.'s current PHW is his son, Antonio Franklin. Jr. The Medicaid-funded IRIS program has paid approximately $315,000 for FRANKLIN Sr.'s cares from 2012 through early 2023.

## BACKGROUND ON SUPPLEMENTAL SECURITY INCOME

15.     Supplemental Security Income (SSI) is a United States Government income supplement program, funded by general tax revenue, designed to help people who are disabled, and have little or no income, to meet basic needs for food, clothing, and shelter. SSI is needs-based and means tested. Under penalty of perjury, SSI recipients are routinely required by the Social Security Administration to declare all income, housing, banking, living arrangements, automobiles, or if the value of their resources goes over $2,000. SSI recipients are routinely advised by the Social Security Administration they must disclose any changes in their financial circumstances.

4

16.     Individuals receiving payments under Title 16 SSI routinely receive notices and publications that center on reporting work.  Per SSA literature, individuals receiving SSI "must report all earned income you get from wages or self-employment, beginning with the date you filed your SSI application."  SSI recipients are advised that their earnings affect their SSI payments through statements on SSA literature: "We base your SSI payments on how much other income you have. When your income goes up, you SSI payments usually go down. When you earn more than the SSI limit, your payments will stop for those months. Your payments will start again for any month your income drops to less than the SSI limits. Be sure to tell us if your earnings drop, or if you stop working."  SSI recipients are also told that they must report when any of the following occurs: "You start or stop work. Your duties, hours, or pay change.  You start paying expenses for work because of your disability." In addition, self-employed SSI recipients are advised to: "Report any change that could affect the amount of your net earnings from self-employment.  Maintain business records. Provide us with a copy of your federal income tax return when it becomes available."  SSI reporting responsibilities state, "You should report monthly wages as soon as you receive your last payment each month, but no later than the 10th day of the next month. For example, we must receive your monthly wage report for May no later than June 10."  Most of the work-related publications contain a lot of information about work incentives, i.e., programs or provisions that encourage an SSI recipient to work. But all notices and publications stress that all income, work or otherwise, must be reported.  SSI publications include consequences for not reporting income (work), such as overpayments, penalties, and administrative sanctions.

17.     Since he was allowed into the SSI program, FRANKLIN Sr. has received dozens of written notifications from SSA advising him of the above-listed parameters of his

participation in this program, to include work and income reporting requirements. He has received such notices since at least at least the middle of 2017. Per SSA records, the most recent notice was sent to FRANKLIN Sr. on February 28, 2024.

18.    According to Wisconsin DOJ - DCI SA Christina McNichol, a federally deputized Task Force Officer (TFO) for the Social Security Administration - Office of the Inspector General – Cooperative Disability Investigations Unit, Antonio FRANKLIN Sr. is in direct pay for Title 16 SSI disability, on an application from April 20, 2009. In December 2010, an Administrative Law Judge (ALJ) allowed FRANKLIN into the SSI program for soft tissue injury of lower extremity and borderline intellectual functioning.

19.    SA McNichol also provided that, on August 26, 2021, FRANKLIN completed a Continued Disability Review (CDR) mailer (Form SSA-455 Disability Update Report). When asked about any work or self-employment since February 2018, FRANKLIN reported earnings in February 2020 of $145. From April 2020 to October 2020, he reported $3,042/ month. A medical CDR was subsequently obtained for FRANKLIN in 2022. An internal medicine consultative exam (IMCE) report from August 2, 2022, stated that FRANKLIN "Attempted to do some work driving, but this did not work out." In August 2022, the Wisconsin Disability Determination Bureau (DDB) continued FRANKLIN's disability for disorders of muscle, ligament and fascia and borderline intellectual functioning. FRANKLIN receives SSI payments of $848.70/ month, after $94.30/ month is collected for outstanding SSI overpayments. FRANKLIN also receives $179.77/month in State SSI, comprised of an Optional State Supplement for $83.78 and the SSI E-Certification for $95.99. SSI-E is for SSI recipients living at home and in need of at least 40 hours per month of primary long-term support services.

6

## FRANKLIN SR.'S USE OF FACEBOOK AND INSTAGRAM

20.     The IRIS fiscal employer agent, iLife Financial Services, received an anonymous tip that Frankin Sr. did not require the services that were being provided to him under the IRIS program. The anonymous source also advised that FRANKLIN Sr. was receiving Social Security benefits as well. The source provided information that FRANKLIN Sr. could walk, drive, lift weights and was a capable and healthy individual who was using government programs fraudulently. The source advised that FRANKLIN Sr. is the owner of a trucking company, Always Trucking and Loading, LLC. Also provided in the tip were FRANKLIN Sr.'s Facebook page, "AntonioAntonyo," and his Instagram account, "highway_tone_tone." Some of the images included in the tip were:



Dated 04/16/2022 – Caption "Food share paid for my CDL's I'm still in the hood (laughing emoji)"



Dated 07/30/2021 – Caption "Five months of working for myself a super blessing (flex arm emoji) no days off (crying emoji)"



Dated 05/20/2021 – Instagram highway_tone_tone



Dated 03/18/2022 - Instagram highway_tone_



21.    SA Schultz searched Facebook for "Antonio Antonyo" and located the account

for www.facebook.com/antonio.a.franklin. Several of the images provided by the anonymous

10

source were located on this page. Additionally, the following photos were also located:



Dated 09/06/2023



Dated 11/23/2023



Dated 06/14/2023

22.     While there was no birthday listed on this Facebook page, SA Schultz located a post from March 13, 2023, sharing a video from Instagram account "highway_tone_tone" of FRANKLIN Sr. doing a voice-over for a comedy routine. The video caption is "I'm 44 years old seasoned well baby, you know my shit in order (heart emoji)." The Wisconsin Department of

12

Transportation (WI DOT) and the IRIS program list Antonio FRANKLIN Sr.'s date of birth as March 13, 1979. Based on this, the Facebook post was made on FRANKLIN Sr.'s 44th birthday. SA Schultz compared FRANKLIN Sr.'s driver's license image with the image for the account "Antonio Antonyo" and believes the images are of the same person.

23.     SA Schultz did not locate any posts, videos or images on the Facebook page which indicated FRANKLIN Sr. was physically disabled. To the contrary, there were many images of him standing, driving, walking around or standing on the hood of a semi-truck, unassisted.

24.     There were also several Facebook posts offering employment opportunities:



Dated 05/31/2023 – Caption "I'm looking to hire class A cdl driver, home every night 1 year experience top of the line trucks weekly pay (bag of money emoji) & gotta be a believer of God (hands emoji)"



Dated 11/02/2022 – Caption "Welcome 2 death row trucking (laughing emoji) I'm hiring (flex arm emoji)"

25.    SA Schultz searched Instagram and located the account for "highway_tone_tone" (elo (@highway_tone_tone) • Instagram photos and videos). This page had numerous photographs and videos which included:



Dated 11/23/2023



Dated 08/18/2023

The Instagram page also had a short video from December 15, 2023, of FRANKLIN Sr. backing up what appears to be a semi-truck. In the video FRANKLIN Sr. can be seen manipulating the steering wheel and moving without any apparent difficulty.



The page also had a post from November 6, 2023, of a receipt for $7,135.13 for repair order 409596, which was to "Ship To: Always Trucking & Loading."

15



26.    SA Schultz did not locate any posts, videos or images on the Instagram page which indicated FRANKLIN Sr. was physically disabled. To the contrary, there were many images of him standing, driving, walking around or standing on the hood of a semi-truck, unassisted.

27.    Social Security Administration (SSA) Cooperative Disability Investigations Unit (CDIU) Task Force Officer (TFO) Christina McNichol obtained records from the Wisconsin Department of Financial Institutions (WI DFI) and learned that Always Trucking and Loading was registered on 12/30/2019 as a Domestic Limited Liability Company.  The records associate Antonio FRANKLIN with the business, as well as the addresses of W180N8201 Town Hall Rd., Menomonee Falls, WI 53051 and 2123 N. 41st St., Milwaukee, WI 53208.

28.    TFO McNichol obtained a certified driving record from the Wisconsin Department of Transportation for FRANKLIN Sr. The record showed FRANKLIN Sr. to have a Class A, B, C and D license with H, N and T endorsements. His medical certification is valid until September 25, 2025, with the condition that he is only certified to drive while wearing corrective lenses.

I am aware that 49 C.F.R. § 391.41(b) governs qualifications that must be met for a person to physically drive a commercial motor vehicle. According to 49 C.F.R. § 391.41(b), FRANKLIN Sr. must have proven or indicated that, among other things:

    a. No impairment of a hand or finger which interferes with prehension or power grasping.

    b. No impairment of an arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle.

    c. No clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular or vascular disease which interferes with his/her ability to control and operate a commercial motor vehicle.

    d. No established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle.

29.    iLife provided MFCEAU with the LTCFSs from 07/06/2022 and 08/18/2021. In addition to these, a more recent LTCFS from May 15, 2023, was located on the WISITS (Wisconsin IRIS Self-Directed Information Technology System) website, its.wisits.org. As of April 5, 2024, this is the most recent LTCFS on WISITS. Based on the information provided by FRANKLIN Sr., the May 15, 2023, LTCFS determined FRANKLIN Sr.'s needs to be:

1. Bathing: Needs assistance.

2. Dressing: Needs total assistance.

3. Eating: No assistance needed.

4. Mobility: Needs assistance.

17

5. Toileting: Needs assistance.

6. Transferring: Needs total assistance.

7. Meal Preparation: Needs total assistance.

8. Medication Administration/Management: Needs assistance.

9. Money management: No assistance needed.

10. Laundry/Chores: Needs total assistance.

11. Telephone: No assistance needed.

12. Transportation: "There are safety concerns regarding [Franklin's] driving."

13. Overnight Care/Supervision: Caregiver cannot get at least 6 hours of uninterrupted sleep per night. (Due to having to care for Franklin.)

14. Employment: None.

FRANKLIN is listed as RISK 2: The person is at imminent risk of institutionalization if they do not receive needed assistance or person is currently residing in a nursing home. His notes state: FRANKLIN requires assistance with at least 3 ADL (activities of daily living) and IADL (instrumental activities of daily living) tasks on a routine basis. Without needed supports and services in the community, Antonio FRANKLIN Sr. would be at imminent risk of entering a nursing home to receive care within 6–8 weeks.

    30.    FRANKLIN Sr.'s most recent LTCFS from May 15, 2023, indicates that FRANKLIN Sr. has the following diagnosis:

        a.    Heart/Circulation: Long QT syndrome, Sick Sinus Syndrome, Supraventricular Tachycardia, Ventricular Arrhythmia, Defibrillator, Sinus Bradycardia, Chronic Venous Insufficiency.

18

b.  Musculoskeletal/Neuromuscular: Chronic pain of left leg, Chronic Cervicalgia, Chronic low back pain with sciatica, weakening of right arm, left drop foot.

c.  Other: Ventricular fibrillation arrest.

Also noted in FRANKLIN Sr.'s LTCFS was that he had experienced "dizziness, shortness of breath and lightheadedness due to his cardiac condition". It also noted that he "requires partial assistance with mobility" and used the walls/furniture for additional assistance when walking with his cane as he becomes fatigued with minimal exertion.

31.  The inconsistencies between FRANKLIN Sr.'s DOT licensing requirements and the requirements for the IRIS program show that FRANKLIN Sr. either falsified information with DOT or with Medicaid.

32.  TFO McNichol obtained records from WI DOT which indicated FRANKLIN Sr. is the current registered owner of the following vehicles:

a.  2023 Chevrolet Corvette, identification number 1G1YB2D48P5108524, 2123 North 41st Street, Milwaukee, WI, mailing address of W180N8201 Townhall Road, Menomonee Falls, WI, registered with license plate ATH3967, purchase price $108,392;

b.  2018 Jeep truck, identification number 1C4RJFN92JC283774, 2123 North 41st Street, Milwaukee, WI, mailing address of Wl80N8201 Townhall Road, Menomonee Falls, WI, registered with license plate AMD4476, purchase price $80,199.

33.  McNichol collected official records from WI DOT for Always Trucking & Loading LLC. The records located were associated with:

- Always Trucking& Loading LLC – Menomonee Falls, WI

19

- Always Trucking Loading LLC – Milwaukee, WI

The following three vehicles were associated with these businesses:

    a. 2020 Kenworth Motor Truck Company, truck identification number lXKYD49XlLJ354398, registered with license plate number TS57600, which was valid through December 31, 2023, purchase price of $55,050;

    b. 2015 Kenworth Motor Truck Company, truck identification number 1XKYD49X2FJ459861, registered with license plate TS56048, which expired June 30, 2023, purchase price of $55,050;

    c. 2016 Kenworth Motor Truck Company, truck identification number 1XKYDP9X1GJ481689, registered with IRP plate 50413Z, which was effective August 1, 2022, and expired July 31, 2023; purchase price of $40,050.

    34. The Wisconsin Department of Transportation listed FRANKLIN Sr.'s address as 2123 42nd St., Milwaukee, WI. However, the DHS documents listed FRANKLIN Sr.'s address as W180N8201 Town Hall Rd., Menomonee Falls, WI. TFO McNichol reviewed records during this investigation and determined FRANKLIN Sr. to be associated with the following addresses:

20

- 2123 N. 41st St., Milwaukee, WI 53208

- W180N8201 Town Hall Rd., Menomonee Falls, WI 53051

- 1915 N. 32nd St., Milwaukee, WI 53208

- 7411 W. Marine Dr., Milwaukee, WI

35.     Visits with FRANKLIN Sr. for IRIS purposes are pre-arranged and are held at W180N8201 Town Hall Rd., Menomonee Falls, WI 53051.

36.     The IRIS program is funded by Wisconsin Medicaid. Throughout my training and experience with MFCEAU, I have found that a common IRIS fraud scheme is for an IRIS participant to claim the need for services, hire their own caregivers, and bill for services not needed or rendered. As a result, the PHW and the participant split the money. While FRANKLIN Sr. has medical diagnoses, his IRIS needs indicate that without needed supports and services in the community, he would be at an imminent risk of entering a nursing home within 6–8 weeks. However, per his social media posts in Instagram and Facebook, FRANKLIN Sr. appears to be an able-bodied and healthy individual who owns and operates his own trucking business. The documents from Wisconsin DOT and DFI confirm that FRANKLIN Sr. has a CDL and is associated with Always Trucking and Loading LLC. However, his IRIS documentation indicates that he does not work.

37.     As noted above, many of the posts on FRANKLIN Sr.'s Facebook and Instagram accounts document his physical capabilities, income, and ownership of multiple cars and generally his economic status. The absence of disability would disqualify FRANKLIN Sr. from

the IRIS program, and possession of assets above a minimal threshold would disqualify him from Social Security and IRIS.

38.     Accordingly, there is probable cause to believe that the content stored in the above-mentioned Meta Platforms, Inc. accounts will contain evidence of work, income, and possession of assets that would disqualify FRANKLIN Sr. from the Social Security and IRIS programs currently providing him with benefits if this information was reported as per program requirements.

39.     I believe there is probable cause to obtain content from the above-mentioned Meta Platforms, Inc. I believe FRANKLIN Sr. likely spoke to others about this truck driving business via Facebook Messenger and/or Instagram Direct based on FRANKLIN Sr. advertising employment opportunities with the company. I believe that by reviewing these conversations, it will show that FRANKLIN owns Always Trucking & Loading LLC. It will also likely show that FRANKLIN runs the business and profits financially from it, which would disqualify him from SSI and IRIS.

40.     I also believe it is likely that FRANKLIN Sr. spoke about his IRIS fraud, his Social Security fraud or other frauds, as I know from my training and experience that people engaged in criminal activity often communicate via social media platforms about their involvement and actions related to crimes committed. On April 16, 2022, FRANKLIN Sr's Facebook page showed an image of FRANKLIN Sr. standing in the middle of a street, in front of a white Jeep, two white vehicles and a semi-truck. The caption read, "Food share paid for my CDL's I'm still in the hood (laughing emojis)". I believe that FRANKLIN Sr. was sharing with others that he was profiting from the FoodShare program, a Wisconsin benefit program that assists low-income citizens obtain food. I believe it is likely that other Facebook users likely

22

contacted FRANKLIN Sr. to see how he was able to obtain his CDL, the Jeep, two cars and semi-truck through the FoodShare program.

41.     I believe it is necessary to review FRANKLIN Sr.'s Facebook and Instagram data from July 1, 2019, through present day due to FRANKLIN Sr. receiving a Wisconsin Driver's License, Class A, B, C and D with endorsements H, N and T on January 29, 2020, and Always Trucking & Loading being established as a Limited Liability Company on December 30, 2019. I expect to encounter evidence of criminal activity in the months leading up to and proceeding FRANKLIN obtaining a commercial driver's license.

42.     I believe the information documented or provided by the Department of Health Services (DHS) is truthful and reliable as the information reported is maintained for official use by DHS in the regular course of its official business and obtained during the course of its professional duties as the administrator of Medicaid for the state of Wisconsin.

43.     While I do not know the identity of the original anonymous source, the information provided by the source was substantiated with additional investigation.

44.     I believe the information from TFO Christina McNichol to be truthful and reliable because she is a colleague in the Wisconsin Department of Justice and has worked on this investigation.

45.     I am familiar with the process used by Meta Platforms, Inc., to comply with legal process. Based on my experience, I know that Meta Platforms, Inc., will comply with a

23

Wisconsin court-issued Warrant such as this served electronically through its law enforcement portal.

## BACKGROUND CONCERNING FACEBOOK AND INSTAGRAM[1]

46.     Instagram and Facebook are services owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram and Facebook are free-access social networking services, accessible through their website and their mobile applications, that allow subscribers to acquire and use Instagram and Facebook accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram and Facebook users and the general public.

47.     Meta collects basic contact and personal identifying information from users during the Instagram and Facebook registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

48.     Meta also collects and retains information about how each user accesses and uses Instagram and Facebook.  This includes information about the IP addresses used to create and

_____

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," https://www.facebook.com/privacy/center/,  "Law Enforcement Online Requests," https://www.facebook.com/records/faq/, and "Help Center," https://www.facebook.com/help/; and on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017 , and "Help Center", https://help.instagram.com.

24

use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

49.     Each Instagram and Facebook account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose, but no two users can have the same usernames at the same time.  Instagram and Facebook users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

50.     Instagram and Facebook users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram and Facebook accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram and Facebook usernames, associated Instagram and Facebook accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

51.     Instagram and Facebook users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram and Facebook also allow users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

25

52. Users have several ways to search for friends and associates to follow on Instagram, including allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

53. Each Instagram and Facebook user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

54. One of Instagram's and Facebook's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

55. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram and Facebook. Users receive a notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram and Facebook post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

26

56.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

57.     Instagram and Facebook allow users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

58.     Instagram Direct, Instagram's messaging service, and Facebook Messenger allow users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, profiles, and other information.  Participants in a group conversation can name the group and send invitations to others to join.  Instagram and Facebook users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders cannot view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct and Facebook Messenger also enable users to video chat with each other directly or in groups.

59.     Instagram and Facebook offer services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

27

60.     Instagram and Facebook have a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

61.     Meta collects and retains location information relating to the use of an Instagram or Facebook account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

62.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

63.     In some cases, Instagram and Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

64.     For each Instagram and Facebook user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including

28

usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

65. In my training and experience, evidence of who was using Facebook and/or Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience and as explained above, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

66. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

29

67.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime).

68.     Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

69.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

70.     Based on the forgoing, I request that the Court issue the proposed search warrant.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook account "Antonio Antonyo" ([www.facebook.com/antonio.a.franklin](www.facebook.com/antonio.a.franklin)) and the Instagram account **"highway_tone_tone" (**[instagram.com/highway_tone_tone](instagram.com/highway_tone_tone)) that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.     Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.     All business records and subscriber information, in any form kept, pertaining to the account, including:

    1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

    2.     All Instagram and/or Facebook usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Instagram, third-party websites, and mobile apps (whether active, expired, or removed);

    3.     Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

    4.     Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

    5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

    6.     Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from **July 1, 2019, to present**;

    7.     Privacy and account settings, including change history; and

8.   Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken.

B.   All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from **July 1, 2019, to present**.

C.   All content, records, and other information relating to communications sent from or received by the account from **July 1, 2019, to present**, including but not limited to:

1.   The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.   All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.   All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.   All associated logs and metadata.

D.   All content, records, and other information relating to all other interactions between the account and other Instagram users from **July 1, 2019, to present** including but not limited to:

1.   Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2.   All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.   All contacts and related sync information; and

4.   All associated logs and metadata.

E.   All records of searches performed by the account from **July 1, 2019, to present**.

2

F. All location information, including location history, login activity, information geotags, and related metadata from **July 1, 2019, to present**.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1001 (false statement), 1343 (wire fraud), and 1347 (Health Care Fraud) and 42 U.S.C. § 1383a (Social Security Fraud), including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A. Records reflecting FRANKLIN's business activities, his earnings, his ownership of assets including vehicles, his attempts to hire individuals to work for him or his businesses, his lack of physical or mental disability, and his ability to engage in physical activities;

B. Records reflecting FRANKLIN's communications with any coconspirators and/or his attempts to solicit coconspirators;

C. Evidence indicating how and when the Facebook and Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook and Instagram owner;

D. Evidence indicating the Facebook and Instagram account owner's state of mind as it relates to the crime under investigation;

E. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

F. Evidence of the identify of any co-conspirators, accomplices, aiders and abettors, accessories, and witnesses to the commission of the above offenses;

G. Passwords, encryption keys, and other access information that may be necessary to access the account or identifier listed in Attachment A.

3

<u>**CERTIFICATE OF AUTHENTICITY OF DOMESTIC**</u>
<u>**RECORDS PURSUANT TO FEDERAL RULES OF**</u>
<u>**EVIDENCE 902(11) AND 902(13)**</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ [**GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)**]. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

b.      such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                    Signature